# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:09CR623DJS(MLM) |
| | ) | |
| HERMAN MONSON-PEREZ, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

On January 21, 2010 this matter came before the court for an Evidentiary Hearing on defendant's Motion to Suppress Evidence [Doc. 38] and Motion to Suppress Statements [Doc. 39]. The government filed a written Response. [Doc. 40] At the hearing defendant was present in person and represented by counsel, Mr. Stephen R. Welby. The government was represented by Assistant United States Attorney Tiffany G. Becker. Defendant was assisted with Spanish translation by Mr. Fernando Torres. At the hearing the government presented the testimony of Brett Johnson, Anthony Hojsik, Patrick Budds and Brian Witek. Defendant presented no witnesses. Based on the testimony and evidence adduced and having had an opportunity to observe the witnesses and evaluate their credibility, the undersigned makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

Brett Johnson has been a Special Agent with the Drug Enforcement Administration ("DEA") for 10-1/2 years. He described his extensive investigative experience with, among other things, Title III wiretaps and coded language used by drug dealers, search warrants, traffic stops, etc. In January, 2009 he began an investigation of a Joel Hernandez who was identified by a confidential informant ("CI") as being a multi-gram distributor of cocaine. A controlled purchase was made from Joel Hernandez. Other methods of investigation were also used to corroborate the information. In April 2009 Judge Jean C. Hamilton authorized a wiretap for one of Joel Hernandez' cell phones (target telephone #1) and Judge Rodney W. Sippel authorized wiretaps on two other cell phones used by Joel Hernandez (target telephones #2 and #3). The intercepted calls indicated Joel Hernandez was distributing cocaine here and in Southern Illinois and enabled monitoring officers to identify his buyers and suppliers. During April Joel Hernandez used target telephone #1 to speak to a Jeovanny Perez on an international Mexican cell phone. The call revealed in a coded conversation that Perez was orchestrating a shipment to Joel Hernandez. Further calls indicated that a shipment took place on or about April 17, 2009.

On April 24, 2009 the intercepted calls indicated that Hernandez and Perez would be conducting another transaction. Hernandez told Perez (in code) that he had 65 (meaning $65,000) for him and in another call Hernandez said he had 70 (meaning $70,000) for Perez. Hernandez said he had approximately 3 kilos of

cocaine left, some of which was bad (a reference to its having been shipped in a gas tank) and some good. Perez asked if he wanted to see "Diego" the next day (a reference to 10 kilos of cocaine) and Hernandez said he wanted 2 "manitas" (translated "hands", a reference to 10 kilos).

On April 25, 2009 no couriers were observed. However, on April 26, 2009 intercepted calls indicated that couriers were on the way.

Surveillance was established at Hernandez' residence and his rear garage (which had previously been referenced in intercepted calls). CI information had revealed the method of transportation of the cocaine was in gas tanks and the previously mentioned controlled purchase had produced cocaine that was wet and smelled of gasoline.

The surveilling officers observed Hernandez move an Escalade out of his garage and then at approximately 7:36 P.M. saw a blue Dodge pickup truck pull in the garage. It was occupied by two individuals later identified as defendant Herman Monson-Perez, a.k.a. Francisco Lopez-Zalazar, and co-defendant Rafael Arellanes-Lopez, a.k.a. Carlos Lopez-Lopez. The garage doors were closed and it was quiet on the wires. Approximately 1-1/2 hours later the Dodge pickup truck left the garage. Surveillance was maintained on the house and garage and a federal search warrant for Hernandez' residence and garage was obtained. Searching officers seized 13 kilograms of cocaine from a safe buried in a crawl space in the basement.

Meanwhile, because of the information gathered on the wiretap and the observations made by the officers, SA Johnson requested a traffic stop of the Dodge

truck by local law enforcement officers. The Dodge truck proceeded to a gas station approximately five blocks from the residence where defendant and Arellanes-Lopez were observed getting out of the truck, filling it up with gas and getting back in the truck.

Tony Hojsik has been a Deputy Sheriff in the St. Charles Sheriffs Department for approximately 10 years. On April 26, 2009 he was requested by DEA to stop the aforementioned Dodge truck. Deputy Hojsik and Deputy Lineback set up on Interstate 70 at approximately the 206 mile marker. They conducted radar enforcement of passing vehicles. They observed the Dodge truck traveling 80 mph in a 70 mph zone and saw it change lanes without signaling. They stopped the truck at approximately the 205 mile marker at 9:34 P.M. Deputy Hojsik went to the passenger's side and the officers told the two occupants the reason for the stop. Both men produced Mexican drivers licenses. The drivers' drivers license was in the name of Francisco Lopez-Zalazar. He was later identified as defendant Herman Monson-Perez. The passenger identified himself as Carlos Lopez-Lopez. He was later identified ad Rafael Arellanes-Lopez. The deputies asked defendant in English where he was coming from. He replied "St. Louis." They asked him, in English, how long he had been in St. Louis and he said "Three days I was visiting friends." The co-defendant Arellanes-Lopez, told the officers in Spanish that he did not speak English. The deputies issued a warning ticket for the traffic violation. Gov.Ex.1.

Deputy Hojsik testified he asked if it was alright to search the truck and defendant said he did not mind. Deputy Hojsik said he was confident defendant

understood him.  This interchange is not contained in Deputy Hojsik's Report of the incident.

The deputies had a narcotics-trained canine in their vehicle.  Deputy Hojsik retrieved the dog who did a free air sniff of the vehicle and alerted positively for the presence of a narcotics odor.  Based on the probable cause resulting from the positive sniff, they searched the truck and located tools, including a socket wrench.  Deputy Hojsik said the bolts holding the truck bed looked "tooled."  These bolts were in the area where the dog alerted.  He applied the socket wrench to the bolts and it fit perfectly.

Based on the information from DEA, the probable cause from the positive dog sniff and from the socket wrench match, Deputy Hojsik therefore suspected the gas tank was the source of the odor.  The two men were handcuffed and the truck was towed to Superior Towing, about 15 minutes away.  It is to be noted that because both occupants had Mexican drivers licenses, neither would have been able to drive the truck from the scene.

At the tow lot, the truck was further searched and $85,000 in vacuum-sealed plastic bags was found floating in the gas tank.  The two men were placed under arrest and incident to their arrest, cell phones were seized from them.

Patrick Budds is a Police Officer with the City of O'Fallon, Missouri who is detached to DEA.  He has 10-1/2 years of law enforcement experience and has been detached for 11 months.  He was one of the investigators in the Joel Hernandez case.  When the case agent told him they had information regarding a delivery on April 26,

2009 he responded to Hernandez' residence and set up surveillance on the rear garage. He saw the truck leave the garage with two Hispanic males inside, saw it go to the gas station where the same two Hispanic males exited the truck, got gas and then proceeded to the highway. He saw the St. Charles deputies stop the truck and he remained in the area. He then responded to the Superior Towing lot. He was directed to download the cell phones for DEA and extract numbers from the phones. He wrote down the numbers of incoming calls. The equipment was able to download the contacts but could not take incoming or outgoing calls. No text messages or contents of messages were extracted.[1] The two men were released after the search and interview at the tow lot.

Brian Witek has been a Special Agent with DEA for four years. He speaks Spanish fluently having learned it at home and having spoken it his whole life. He has conducted numerous interviews in Spanish and is able to communicate effectively.

---

[1]     Although not elicited at the hearing the government's Response at page 6 states:

> Telephone exploitation of defendant Monson-Perez' cellular telephone (816) 977-0632, a sequential number to Arellanes-Lopez' phone, showed target telephone #1(utilized by Hernandez) stored in the device as well as Jeovanny Perez' international Mexican cellular telephone. The telephone exploitation of a second cellular device in the possession of Monson-Perez, (816) 204-6305 was found to have target telephone #3 (utilized by Hernandez) stored in the device.

On April 26, 2009 he was asked to respond to Superior Towing to speak to defendant Herman Monson-Perez (and Rafael Arellanes-Lopez). SA Witek in the presence of SA Budds advised defendant Monson-Perez of his <u>Miranda</u> rights in Spanish by reading from a rights card, one side of which was written in Spanish. Gov.Ex.2. SA Witek then presented defendant with a rights advice and waiver form. Gov.Ex.3. This form is written in English but SA Witek translated it line-by-line into Spanish, told defendant it said the same thing in English and when defendant understood he placed his initials by that line. No threats, no display of weapons, no representations or promises, were made to induce defendant to make a statement. He signed the form indicating he wanted to waive his rights and make a statement. He signed using the false name he had given, "Francisco Lopez", although it appears he mis-spelled it. The form is dated 4/27/09. SA Witek's explanation was that the stop was late on the 26th and by the time he did the interview it was after midnight on the 27th.

SA Witek asked if defendant knew about the money. He said he thought someone put packages of money in the passenger side door. He said the truck was not his and that he and his passenger entered the United States illegally on their way to Kansas City to visit friends. He said on April 25, 2009 he met a person at a Mexican restaurant who gave him keys to a white truck and said he would get paid by "El Cholo." He said he believed the money came from "Joel" who lived in St. Louis and "El Cholo" was going to pay him $1,000 in exchange for transporting the

money.[2] Defendant did not appear drunk, high on drugs, or in anyway incapacitated when he made his statement and he was not threatened, coerced or promised anything to speak to SA Witek.

---

[2] SA Witek's testimony was somewhat vague on the contents of defendant's statement perhaps because of faulty memory and the fact that he did not have his report in front of him. The government's Response, Doc. 40 at 7, states:

> Monson-Perez said that on April 25, 2009 another subject, identified by Monson-Perez as Raul Payan, asked him if he wanted to make a trip for him to St. Louis, Mo. Monson-Perez later met with Payan on Independent Street in Kansas City, Missouri, during which time Payan told him that an unknown Hispanic male known only as "El Cholo" will later meet with him and give him the keys to a white pickup truck. Monson-Perez stated that he and Arellanes-Lopez departed from Kansas City, Missouri in a while pickup truck after "El Cholo" gave him the keys to the vehicle. He and Arellanes-Lopez arrived in St. Louis, Missouri and parked the white pickup truck on Chippewa in South St. Louis city. Monson-Perez said that he and Arellanes-Lopez were eating at El Torito Mexican Restaurant when an unknown Hispanic male in a blue Nissan Altima told him that a blue Dodge Ram pickup truck was parked outside, and said that packages of money were inside the doors and gave him keys to the blue Dodge Ram pickup truck.

> Monson-Perez said that he believed the money was from an Hispanic male named "Joel" who lived in St. Louis, Mo. and that he was supposed to deliver the money to Kansas City and that "El Cholo," who is the cousin of Raul Payan, is the person who was ultimately supposed to receive the packages of money. Monson-Perez stated that "El Cholo" was going to pay him $1,000 in exchange for him transporting the money.

## CONCLUSIONS OF LAW

Defendant moves to suppress statements made both to the St. Charles deputies and to Spanish-speaking DEA Agent Witek. He also moves to suppress the seizure of and exploitation of data from cell phones. The Motions should be denied.

**1.     Statements made during traffic stop**

It is well established that when a police officer observes a traffic violation - - however minor - he has probable cause to stop the vehicle. <u>Whren v. United States</u>, 517 U.S. 806(1996); <u>United States v. Gomez Serena</u>, 368 F.3d 1037, 1040 (8th Cir. 2004) (Police officer can stop vehicle with expired tags); <u>United States v. Foley</u>, 206 F.3d, 802, 805 (8th Cir. 2000); <u>United States v. Bell</u>, 86 F.3d 820 (8th Cir.), <u>cert. denied</u>, 519 U.S. 955 (1996); <u>United States v. Garcia</u>, 23 F.3d 1331, 1334 (8th Cir. 1994); <u>United States v. Ramos</u>, 20 F.3d 348, 351 (8th Cir. 1994); <u>United States v. Miller</u>, 20 F.3d 926 (8th Cir. 1994); <u>United States v. Barahona</u>, 990 F.2d 412 (8th Cir. 1993); <u>United States v. Cummins</u>, 920 F.2d 498, 500 (8th Cir. 1990), <u>cert. denied</u>, 502 U.S. 962, 112 S.Ct. 428 (1991); <u>see</u> <u>Pennsylvania v. Mimms</u>, 434 U.S. 106 (1977); <u>United States v. Pillow</u>, 842 F.2d 1001 (8th Cir. 1988).

Any traffic stop is constitutional no matter the officer's actual motive so long as the officer had probable cause to believe that a traffic violation occurred. <u>See</u> <u>Whren</u>, 517 U.S. at 813; <u>United States v. Long</u>, 320 F.3d 795, 798 (8th Cir. 2003).

An "otherwise valid stop does not become unreasonable merely because the officer has intuitive suspicions that the occupants of the car are engaged in some sort of criminal activity." <u>United States v. Cummins</u>, 920 F.2d 498, 501 (8th Cir. 1990),

cert. denied, 502 U.S. 962 (1991). The Supreme Court has stated in unmistakable terms that we are to make "an objective assessment of the officer's actions," Scott v. United States, 436 U.S. 128, 136 (1978), and his actual state of mind is of no significance in this Fourth Amendment analysis. Wren, 517 U.S. at 813; Cummins, 920 F.2d at 501.

Here it is undisputed that defendant Monson-Perez committed traffic violations by traveling 80 mph in a 70 mph zone and changing lanes without signaling. These are prohibited by Missouri law. Therefore, regardless of any other information (from DEA) of which the officers were aware, the stop was lawful.[3]

Given the lawfulness of the initial stop, the issue becomes whether the resulting detention of the defendant was "reasonably related in scope to the circumstances which justified the interference in the first place." Terry v. Ohio, 392

---

[3]    In this case, even absent a traffic violation, the stop was permissible in light of the information from DEA agents about the wiretaps and the surveillance of the truck leaving Joel Hernandez' residence. Police officers are permitted to conduct "investigative stops" if they have reasonable articulable suspicion that criminal activity may be afoot. Terry v. Ohio, 392 U.S. 1, 30 (1968); United States v. Watts, 7 F.3d 122, 125 (8th Cir. 1993). Automobiles, as well as people, are subject to Terry stops. Watts, 7 F.3d at 125. See United States v. Spotts, 275 F.3d 714, 718 (8th Cir. 2002) citing United States v. Bell, 183 F.3d 746, 749 (8th Cir. 1999).   An officer may rely on information provided by other officers and all of the information known to the team of officers involved in the investigation to provide justification for a stop. United States v. Gonzales, 220 F.3d 922, 925-26 (8th Cir. 2000)(state trooper who received description of vehicle from investigator had probable cause to arrest driver of vehicle); see also United States v. Gillette, 245 F.3d 1032, 1034 (8th Cir.)(when officers worked together on an investigation, "collective knowledge" theory may be used to impute the knowledge of one officer to another); cert. denied, 122 S.Ct. 415 (2001); United States v. Robinson, 119 F.3d 663, 666 (8th Cir. 1997). Thus, the St. Charles deputies had reasonable, articulable suspicion that criminal activity was afoot and the stop of the Dodge pickup truck was lawful.

U.S. 1, 20 (1968); <u>United States v. Ramos</u>, 20 F.3d 348, 351 (8th Cir. 1994); <u>United States v. Barahona</u>, 990 F.2d 412, 416 (8th Cir. 1993); <u>United States v. Cummins</u>, 920 F.2d 498, 502 (8th Cir. 1990), <u>cert. denied</u>, 502 U.S. 962 (1991).

An officer at a traffic stop can check the driver's identification and vehicle registration, ask the driver to step out of his vehicle and ask routine questions concerning the driver's destination and the purpose of his trip. <u>United States v. Long</u>, 320 F.3d 795, 799 (8th Cir. 2003). <u>See also</u> <u>United States v. Gomez Serena</u>, 368 F.3d 1037, 1040 (8th Cir. 2004) (A reasonable investigation of a justifiable traffic stop may include checking the driver's license and registration, asking the driver to step out of the vehicle, asking the driver to sit in the patrol car, and requesting the driver's destination and purpose); <u>United States v. Gregory</u>, 302 F.3d 805, 809 (8th Cir. 2002); <u>United States v. Ramos</u>, 42 F.3d 1160, 1163 (8th Cir. 1994).

Here Deputy Hojsik asked defendant for his drivers license and he produced a Mexican drivers license. He asked defendant where he was coming from and how long he had been here and defendant responded "St. Louis" and "Three days I was visiting friends." These questions were well within the scope of the detention and should not be suppressed. Whether defendant was able to communicate this much information in English goes to the weight of the evidence, not its admissibility.

2.    **Statements made post-arrest**

Defendant also seeks to suppress statements he made in Spanish to Spanish-speaking DEA Special Agent Brian Witek. The evidence is clear that SA Witek is fluent in Spanish, having spoken it at home while growing up. He has done

numerous Spanish interviews. Here, because defendant was in custody, he advised him of his <u>Miranda</u> rights in Spanish by reading them from the <u>Miranda</u> rights card written in Spanish. Gov.Ex.2. He translated the Waiver Form into Spanish for defendant and defendant signed it. Gov.Ex.3. No threats or promises were made to induce defendant to make a statement.

A defendant may knowingly and intelligently waive his rights and agree to answer questions. <u>Miranda v. Arizona</u>, 384 U.S. 436, 479 (1966). When the prosecution seeks to introduce in evidence a statement made by a defendant while in custody, it has the burden of showing by a preponderance of the evidence that the statement was made after a voluntary, knowing and intelligent waiver of the <u>Miranda</u> rights by the defendant. <u>Colorado v. Connelly</u>, 479 U.S. 157 (1986). "The requirement that <u>Miranda</u> warnings be given does not, of course, dispense with the voluntariness inquiry" <u>Dickerson v. United States</u>, 530 U.S. 428, 444 (2000). The court must look to the totality of the circumstances surrounding the interrogation to determine whether the waiver was the product of a free and deliberate choice, rather than intimidation, coercion, or deception; and whether the waiver was made with an awareness of the right being abandoned and the consequences of the decision to abandon it. <u>Moran v. Burbine</u>, 475 U.S. 412 (1986).

The statement must be voluntary and not the product of any police conduct by which the defendant's will is overborne. <u>Haynes v. Washington</u>, 373 U.S. 503 (1963); <u>Colorado v. Connelly,</u> 479 U.S. at 170. However, as the Supreme Court stated in <u>Berkemer v. McCarthy</u>, 468 U.S. 420 (1984), "[c]ases in which a defendant

can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that law enforcement authorities adhered to the dictates of <u>Miranda</u> are rare." <u>Id.</u> at 433 n. 20; <u>Dickerson</u>, 530 U.S. at 444.

Here the facts that defendant mis-spelled his false name and that his statement was somewhat bizarre are irrelevant. The crucial issue is whether defendant voluntarily spoke to SA Witek after being advised of his rights. There is absolutely no evidence that his "will was overborne." This is clearly not one of the "rare" cases referred to in <u>Berkemer</u>.

**3.    The seizure of the cell phones and the extraction of data from them**

The officers testified that defendant was placed under arrest when they discovered the $85,000 in the gas tank of the Dodge truck. While that may have been the "official" arrest, the court finds that defendant was under arrest when he was detained by the side of the road.[4]    After the dog alerted to the presence of narcotics, there was probable cause to search the vehicle and, therefore, the automobile exception to the warrant requirement comes into play. <u>United States v. Bloomfield</u>, 40 F.3d 910, 919 (8th Cir. 994). Probable cause means "there is a fair probability that contraband or evidence of a crime will be found in a particular place." <u>Illinois v. Gates</u>, 462 U.S. 213, 238 (1983). A dog alert, without more, gives probable cause for searches and seizures. <u>Bloomfield</u>, 40 F.3d at 919; <u>United States</u>

---

[4]        This court is not bound by the government's theory of the case. <u>United States v. Sherrill</u>, 27 F.3d 344, 347 (8th Cir.), <u>cert. denied</u>, 513 U.S. 1048 (1994); <u>see also</u> <u>United States v. Jones</u>, 990 F.2d 405, 408 (8th Cir.) (reviewing court is not limited by detaining officer's subjective opinion in deciding whether reasonable suspicion to detain luggage existed), <u>cert. denied</u>, 510 U.S. 934 (1993).

v. Maejia, 928 F.2d, 810, 815 (8th Cir. 1991) ; United States v. Longbehn, 898 F.2d 635, 640 (8th Cir. 1990). If there is probable cause to believe an automobile contains contraband, a warrantless search of the automobile is reasonable. United States v. Ross, 456 U.S. 798, 809 (1982); Chambers v. Maroney, 399 U.S. 42, 52 (1969). The automobile exception to the warrant requirement includes containers found in the automobile. Ross, 456 U.S. at 822.

If police have probable cause to search a car, they need not get a warrant first even if they have time and opportunity. United States v. Ludwig, 10 F.3d 1523, 1528 (10th Cir. 1993); United States v. Crabb, 952 F.2d 1245, 1246 (10th Cir. 1991), cert. denied, 112 S.Ct. 1981 (1992). Therefore, assuming the cell phones were seized at that time, the deputies had information from the wiretaps, the surveillance of the truck leaving Joel Hernandez' residence and the match of the socket wrench with the "tooled" bolts on the bed of the truck where the dog alerted. The officers had probable cause to arrest defendant at that time and Deputy Hojsik specifically admitted he was "not free to go."

Probable cause for a warrantless arrest exists "if the facts and circumstances within the law enforcement officer's knowledge are sufficient to warrant a prudent person, or one of reasonable caution in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." United States v. Morales, 923 F.2d 621, 623 (8th Cir. 1991) (internal quotations, modifications and citations omitted). The probable cause determination does not depend on individual facts; rather "it depends on the cumulative effect of the facts

in the totality of the circumstances."  Id.  at 623-24 (internal quotations, modifications and citations omitted).  See also United States v. Durile Lee Brown, 49 F.3d 1346 (8th Cir. 1995).

It is not clear to the undersigned whether the cell phones were actually seized during the search by the side of the road or at the tow lot.  Either way, they were seized incident to defendant's arrest and the seizure was proper.  Law enforcement officers making a valid custodial arrest are entitled to conduct a warrantless search of the defendant as well as the area from which he might obtain a weapon or destroy evidence.  Chimel v. California, 395 U.S. 752 (1969).

Even if defendant was not under arrest, the officers had probable cause to believe that the vehicle searched contained contraband or evidence.  Accordingly, they could search the vehicle without a warrant.  Chambers v. Maroney, 399 U.S. 42 (1970); United States v. Bloomfield, 40 F.3d 910, 919 (8th Cir. 1994), cert. denied, 514 U.S. 1113 (1995).  This search of the vehicle may include the trunk area, and any items or containers found in the vehicle.  California v. Acevedo, 500 U.S. 565 (1991); United States v. Ross, 456 U.S. 798 (1982).

Defendant argues, however, that even if the seizure was legal, he did not consent to the extraction of data from the cell phones.

In United States v. James, 2008 WL 1925032 at *3-9 (E.D.Mo., April 29, 2008) the court held that "because probable cause existed to believe that evidence of a crime would be found in the cell phone call records and address book, the automobile exception allows the search of the cell phone just as it allows a search of

other closed containers found in vehicles." See also United States v. Fierros-Alvarez, 2008 WL 1826188 (D.Kan., April 23, 2008) (automobile exception justified search of cell phone found in vehicle). Therefore, the seizure of the cell phones and the extraction of data from them was legal.

"It is well settled that 'in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that amendment.'" United States v. Finley, 477 F.3d 250, 259 (5th Cir. 2007). In Finley, the defendant was searched pursuant to a lawful custodial arrest and a law enforcement officer searched his cellular telephone incident to that arrest. Id. at 260. In upholding that search and rejecting the Motion to Suppress, the call records and text messages received from that device, the Seventh Circuit noted:

> Police officers are not constrained to search only for weapons or instruments of escape on the arrestee's person; they may also, without any additional justification, look for evidence of the arrestee's crime on his person in order to preserve it for use at trial. The permissible scope of a search incident to a lawful arrest extends to containers found on the arrestee's person.

Id. at 259-60.

Here, the extraction of data from the cell phones was lawful and properly conducted before the information could be deleted, destroyed or overwritten. This evidence demonstrates contact between Joel Hernandez, the source of supply, Perez, and shows defendant's involvement in the conspiracy. The data should not be suppressed.

Accordingly,

**IT IS HEREBY RECOMMENDED** that defendant's Motion to Suppress Evidence be **DENIED.** [Doc. 38]

**IT IS FURTHER RECOMMENDED** that defendant's Motion to Suppress Statements be **DENIED.** [Doc. 39]

The parties are advised that they have fourteen (14) days in which to file written objections to this report and recommendation pursuant to 28 U.S.C. §636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

/s/Mary Ann L. Medler
MARY ANN L. MEDLER
UNITED STATES MAGISTRATE JUDGE

Dated this   29th   day of  January, 2010.